May it please the Court, my name is Steve Schutze, I represent the appellant Toro-Aire, Inc. in this appeal. I first wanted to address something that I read in the respondent's brief and I believe it's incorrect. In reading the underlying court's ruling, the underlying court never found that the entire declaration of Mr. McIntyre was hearsay. The court found that there are certain parts of the declaration that were hearsay, but not the entire declaration. Specifically, what I'd like to direct the court's attention to is paragraph 6 of the declaration in which Mr. McIntyre's declaration says, and it's for the court, it's the electronic record, page 68, paragraph 6, replacement of the coils was a major project which required the removal of previously installed drywall, insulation, ceilings, pipings, valves, wiring, controls, adhesives, ceilings, connecting ductwork, hangers, bracing, and other completed items of work by other contractors. In this appeal, that particular paragraph, we believe, establishes a triable issue of material fact because we're not just talking about replacement of the cost of workmanship of the coils themselves. You're talking about having to go in and physically remove them, but in doing so you are undoing the work of other subcontractors. Counsel, I am not a California lawyer, so I am never as confident about my reading of California cases, but it appears to me that the general rule in California is that damages caused by repair efforts of this sort are not recoverable under a general liability policy like the one at issue here unless hazardous materials are involved, like the almonds in the cereal or the lead pipes that poison the water. As I understand it, that's the general rule, and as I understand it, there's no hazardous material involved in this case. Would you tell me where I've gone wrong? Yeah, in a couple respects. First of all, pertaining to the Armstrong case, which is one of the cases that talks about hazardous materials. That's the asbestos case. That's the asbestos case. In the Armstrong case, if you read that court's ruling, the court's ruling wasn't based upon the fact that solely because the asbestos was hazardous. It actually expanded what would constitute physical damage, which would include the installation of the asbestos material. The court in Armstrong did not limit itself, though, to hazardous materials. The language in that particular case was very broad. But that's what it was about. Is there any case that you can point to in a California appellate court that had a similar exception or a similar application to repair work that did not involve any hazardous materials? Well, I think the key case applying California law is the St. Paul Fire Marine case versus Sears, which is a Ninth Circuit case. It was decided in 1979. But that was under a different provision, insurance provision. That was an earlier version of the CGL policy. Yes, it is. But that Sears case has been cited in California courts as still good law. And in that case, that case involved the removal of defective roofing. And it says that in doing so, when you have to repair the work of other subcontractors, the work of the other subcontractors that you had to repair would be covered. If we look at this court's ruling in F&H Construction, which is a California case, F&H Construction dealt with some pile caps. And it drew the very distinction that I was asking about because it said that Armstrong and another case, the name of which escapes me, is not applicable because F&H did not involve hazardous materials, whereas Armstrong involved contamination by a hazardous material. So why isn't that further support for the distinction that I saw in these cases? Because in F&H Construction, what that involved is the welding of caps to piles that did not damage the piles themselves. So it was fixing the problem but not undoing other subcontractors' work. So that particular case did not involve the repair. You didn't have to go into the wall and pull out the other subcontractors' work. And that holding is specifically limited to what the court said. It says, we therefore hold that the welding the lower grade pile caps to the driven piles does not constitute physical injury. So what you were talking about is a repair of a defective part, but you weren't talking about work that required you to undo repair work of other subcontractors. Is there anything other than Sears that's post-1979 that is from a California court that adopts the interpretation in a non-hazardous case, the interpretation that you're urging us to adopt? Anything other than Sears? Yeah. There's, we talked about Armstrong and there's the Shoddy Foods case, which is wood splinters that were in a particular series. Here, this case does seem to fall somewhat between the cracks because, well, both because of the fact that you have to undo a massive amount of other stuff, but also the problem here is not that these coils were unacceptable in the sense that they were unattractive or dysfunctional, like cracked concrete or shoddy walls or something else. The problem was that they were going to leak. Correct. What's the record about, was the leak like short little leaks that weren't going to actually, I mean, intermittent leaks or could there be a big burst or what? I mean, what exactly was wrong with these things? And I mean, at some point, I guess what I'm saying, it seems to me that a potentially leaking something could be similar to a hazardous product if it's going to cause a huge flood, but I don't know what the record is on this. Yeah, the record, and in all candor, the record is not well developed. The allegation made by UCLA was that the coils were leaking. But there's no evidence to support that. That's true. So there's no evidence of water damage. There's no evidence of leakage in the present record. The present record, the letters that were submitted as defendant or respondent point out in their brief, the underlying court held that those were hearsay. And even if they weren't hearsay, they didn't say there was. They said, essentially, we don't know what's going to happen. Correct, correct. And for purposes of appeal, I think the key fact is that the coils had to be replaced. And in replacing the coils... But that means, I was just trying to see whether there was any more direct analogy to the hazardous waste cases, hazardous product cases. And essentially you're saying no because the record doesn't support it. If you had coils and the record demonstrated that they could burst and cause a huge flood and it was just a question of whether you were going to take them out before they caused the flood or after they caused the flood, it seems to me you might have something similar to the hazardous product cases. They weren't going to kill people, but they were going to cause a huge mess. But you're saying that isn't really the case we've got. We just know they're defective in some way. Correct, correct. That is true. And I do want to point out another distinction that I think is important. If you look at the F8H construction case and it's also the Golden Eagle case, which is a case that's from this circuit, both of those were claims against subcontractors for either their own workmanship or for the subcontractor putting in defective materials. This case is Toro Air is a supplier of materials. It's a defective product. They were not a subcontractor. And that is a distinction that I think is important to recognize because while a subcontractor who's actually working at the facility and installing materials can look at the materials and know where in the sequence of events they are performing their work, a supplier doesn't necessarily know that. They don't know where in relation to their work is doing it. And the course talks about the Golden Eagle case talks about it and so does the F8H talk about it. It's the cost of doing business for subcontractors. But it's different for suppliers. Suppliers sell a product and then where it falls in the construction scheme and where the defect occurs is really beyond their control. And as in this case. Well, it's beyond their control, but they know it. You're not going to put a heating coil, you know, sitting out on a piece of furniture. I mean, it's inherently something that goes into a wall. That's true. But, you know, hypothetically the failure, you could do testing upon installation and the failure could be, you know, detected at that time as opposed to after further work has been performed by other subcontractors in performing the work. So I think that the defective product issue versus the defective workmanship issue is a distinction. It's not just a distinction I'm making, but under California law, and I know that the case is limited or the case talks about asbestos, but it specifically made that distinction in Armstrong saying that the insurers rely upon the rule that physical incorporation of a defective product into another does not constitute property damage unless there is physical harm to the whole. In our view, that rule is designed to limit liability coverage of contractors against claims of defective materials or poor workmanship for such claims are a commercial risk which is not passed on to the liability insurer. Armstrong, okay, I'm sorry. I think we know what Armstrong says. But is there a California case, you said there's no California case in your favor. Is there any California case currently against you? That is, is there any California case in which the product was embedded in this way such that in order to get at it, there had to be major destruction of other products and other contractors? Yeah, the answer to that question is no. And that's why I believe that the Getty's one case and the St. Paul Marine versus Sears case, even though they were applying a different liability coverage, liability policy, those are still controlling, there's still good law because those cases directly involve claims against suppliers where there's work that needed to be undone by other subcontractors. And they said that while the product itself is not covered, the repair work for the other subcontractors. Do you want to comment at all on the Estoppel issue? I do. As to the Estoppel issue, it's correct that in the underlying case, there was a demur file as to the negligence cause of action and that the university didn't oppose it and there was a judgment and they just proceeded on their breach of contract case. But the contract damages... And one of the things they did was take the leakage allegation out of the complaint. Correct, correct. But the recoverable damages by the university, UCLA, was the same in that case because they could proceed under their breach of contract cause of action in state court and recover all the same damages that they would have recovered under the negligence cause of action. But your position at that point was that these were only economic damages. Correct. And your position now is that they're not only economic damages, economic meaning loss of value or something of that kind, that they resulted from, quote, physical injury. So the issues, I mean, I'm not sure they're exactly the same, but verbally they're exactly the same. I mean, the demur said this was not a physical injury, this was economic damages. Right. But under the Vandenberg case... I understand it doesn't matter whether it's contract or negligence, but that isn't really the point. The point is that the particular issue that you litigated, was this a physical injury or was it economic damages? That was the question. It wasn't, is this negligence or contract? And why isn't that the same question that we're dealing with now? Because all the same damage, whatever label you put on it, UCLA was asserting all the same damages in their contract cause of action, including the cost... If you took the position that those damages were not physical injury, they were economic damages, and that's what you prevailed on, is there some difference between those concepts for purposes of deciding whether the economic, what's the phrase in the negligence world, the economic damages rule, whatever it is, prevails and what the coverage is of this policy provision? No, they're two different inquiries, because under the breach of contract cause of action, the university still could recover the same damages for which there would be coverage on their policies. I understand they could recover the same damages, but the question is what are they recovering them as? You said they were recovering them as economic damages, not physical injury. Right. And is that determination binding? No, it's not, because Toro Air didn't derive any type of benefit from that ruling. If they're still liable for all the same damages, there's no benefit to them for the university only to proceed under the breach of contract action as opposed to the negligence cause of action. And that's actually a critical inquiry for the doctrine of judicial estoppel that applies. While it's true that they did take that position, at the end of the day it really was a distinction without a difference. Well, except that you got the negligence cause of action out of there, and supposedly the negligence cause of action could have led to different and larger damages, for example, punitive damages and other things. Well, first of all, there's never punitive damages that was alleged in the underlying case. And second of all, in the underlying case, I'm not aware, and there's no evidence in the record that the university was seeking any different type of damages by way of their not opposing the demer on the negligence cause of action. They start all the same damages. I see my time's up, so if there's... The panel has any other questions? What was the critical provision in this insurance policy? The critical provision is the language... General and policies, they don't cover this problem. Well, we disagree. The coverage provision says physical injury to tangible property, and we believe that when there is work that is required to access the coils by going into drywall... Breaking into the walls and all that. That constitutes physical injury to tangible property. Under longstanding California case law, that is in the Ninth Circuit Court in Sears, albeit those were different language, I think the principles still apply. And there's been no case that I found which says that when you have the product supplier, that they wouldn't have that coverage. That's what they're purchasing the coverage for. Any other questions? Well, the carrier paid your client's attorney's fees. They did. Yeah, this is not a duty to defend case. This is a duty to indemnify case. The underlying case was settled and paid by Toro Air, and they're seeking indemnity back from their insurance carrier. Thank you very much. I'm sorry. In other words, your client wasn't aware of any limitations on what property damage encompassed the term. That's a tough question to answer. I think that what's defined as physical injury to tangible property is what's stated in the policy and then what's stated in the case law. I think in the underlying case, Toro Air was trying to defend itself the best way that they believed they could. Ultimately, the ultimate settlement was not apportioned between what percentage was for this amount, what percentage was for this, and whatnot. I do know that I guess the only part of the settlement that I guess you probably could apportion was Toro Air agreed to forego certain payments that they were entitled to receive from UCLA as part of the settlement. But I think that Toro Air was always defending the claims of UCLA, which encompassed all those factors. The cost of replacement of the coils, which under the law would clearly not be covered, then the cost of fixing up the damages done by the other subcontractors or damages when you have to access the coils. Cutting through the walls. Cutting through the walls and whatnot. I think that was part of UCLA's claim. And your client, as far as the record shows, believed that all those expenses were covered. No. I think it's pretty clear under the law that the cost of the actual replacement, the coils themselves, that would be a defective product and that would not be covered. It's our client's contention that the cost of repairing the access issues to get to the coils would be covered. Because that would not be work that they did themselves. That would not be their own product. That would be cost to fix what other contractors had already done. So your client had other coverage on the devices themselves? There was another insurance policy, but I'm not sure what the scope of that coverage was. I didn't look into that. I don't know the answer to that question. Well, since we're way, way over, can I ask one question? You said there weren't any cases directly against you. What about the New Hampshire insurance company case in this court? I don't think the New Hampshire v. Vieira case is against us. First of all, that case largely dealt with diminution in value. But more importantly — Well, no, it didn't. It dealt with the fact that the cost of repair is equivalent to diminution in value. But I think that in that case, the cost of repair, there wasn't repairing what other subcontractors had done. It was actually the cost to add additional drywall. That case actually talked about distinguish itself from the Sears case. Like poking holes in the roof and then having to fix the roof. But what it stated in that case, in the present repairing the defective installation requiring adding drywall, not removing it. So they added drywall, not repairing it. So you think the result in Vieira would have been different if they'd been removing it instead of adding it? Where do you take that? Yes, I think that's the distinction that the courts have made. When there's an addition covering up, I think that's a distinction that has been made going back to the Sears case, where they were actually repairing and not adding to or covering up. I think covering up would clearly not be covered, but repairing something that had to be undone would be something that would be covered. Thank you very much. May it please the Court. Mary McPherson on behalf of Respondent Federal Insurance Company. Our position is that the Federal District Court was correct at the time of settlement. There's absolutely no evidence of any physical injury to third-party property caused by the coil. Yes, they had to go through, cut holes in the wall to get it out. But California law is clear. The Golden Eagle case says this, the Ninth Circuit case says this in Vieira, that the method of repair cannot create coverage. And that is exactly what Toro Air is arguing here. They're saying that the drywall that was put up by a subcontractor is the third-party property that had been damaged. But that's not correct. There is no evidence that the coil leaked in the first instance, or that even if the coil leaked, that it damaged the drywall, making it wet, and thus having to repair the drywall. No, that's not the case. It simply is like Vieira. How do you get in there? How do you get in there to check the coil? That's the method of repair. It's not the physical injury. The drywall was never injured. It's just the method of repair. But look, you know, if someone puts in some copper plumbing in your house, and you get a leak where a joint is sweated, and you got moisture in there, well, the only way you're going to be able to correct it is to cut a hole in the wall. So what's the difference? And that's foreseeable. I mean, if you're going to have a leak in a pipe, you have to get to it, and you're going to have to cut through the wall. Here we have a defective product. We do not believe there's any difference between defective workmanship and defective product. Toro Air, as part of its course of doing business, the cost of doing business, is responsible if its products or the ones it installs are defective. Going into the wall, cutting a hole in it to replace it, is part of the replacement, repair and replacement of its own product. Why does the record have shown that there were leaks? Pardon? We would then be looking at, and that was a question asked by the district court, and it's a hypothetical because we don't have that evidence. Then that portion of the drywall or whatever that was in fact physically injured may have been covered property damage if it weren't excluded by the impaired property exclusion or some other exclusion in the policy. And those allegations were the reason that federal, and this is to answer your question, Judge Prayerson, decided to defend and continued to defend through settlement. You defended under a reservation of rights so they knew that you might not cover the ultimate liability if any were found. That is exactly right. And attached to the declaration of Stephen Newton are detailed letters, several of them, explaining, we will defend you because there is a potential for damage. We want to make it clear, and we cited all of the case law in an appendix to the reservation of rights, and pointed out we will not be responsible for any cost of repair or replacement. And the repair, the cutting through the wall, is part of that cost for your defective product. To go back to my hypothetical, I thought there was some case law to the contrary. Your view is that even if there had been leaks, the only thing that they could have been covered for was whatever drywall was hurt by the leaks, not for getting those things out of there now that they were leaking. That's correct. And that's under well-established California law. You would ask, are there any other cases like this? We've got F&H Construction, which was... F&H Construction really was different. And it says specifically in it that the only thing, they were not taking away the piles. They were simply replacing the caps. Correct. They opted to repair them in that way. In the Vieira case, they cut through... But they were not, in fact, injuring anybody. They did not have to injure anybody else's property to do it, and they didn't. That's correct. All right, so it's irrelevant, so let's go to another one. The Vieira case, they had to cut through the roof to do that. Right, okay. Golden Eagle, which is cited in our brief, but not discussed at length, but discussed by the district court, they had poured cement. They had to pull off all of the floor coverings, akin to going through a wall and replace all those floor coverings. The court said, that's the method of repair. Well, they didn't really say very much. They didn't really say that isn't physical injury. They just kind of forgot about it. Your Honor, we submit that's analogous. How is that any different than cutting through a wall? You have to take this carpet up to go and fix the problem. You have to cut through that wall to pull out the device. That is the cost of repair. I also wonder whether it makes any difference in terms of the hazardous product cases that in Golden Eagle, and I'm not sure about Vieira, but in Golden Eagle, what you had was, you know, sort of things that were cracked and unpleasant and so on, but they weren't dangerous in any way. That's correct. And here, we don't really, I understand there's a record problem, but if the stuff was already leaking, it seems to me that that's a different level of potential risk, both to people and property in the sense that it's not just, it can get wet, it can get flooded. I would disagree. The cases that have held hazardous problems. Hazardous to people. Hazardous to people. And Armstrong, as you know, dealt with asbestos. Montrose Chemical, those kind of cases dealt with toxic chemicals. Even the Sade Foods dealt with splinters getting into breakfast cereal that's going out to thousands of people if they swallowed it. It seems to me that Vieira is the closest because it's, if I remember the facts correctly, the reason for the repair was a fire danger that had not materialized, and here it's a flood danger that had not materialized, but I'm not sure for analytical purposes on level of hazardousness that flood and fire unfulfilled risks should be treated differently. I agree. It would be more akin to Vieira than to these hazardous materials. And I just found this case this weekend. It's in my briefcase, and it goes to another question Judge Berzon raised earlier about what about, we know there's no evidence of actual leaking, but wasn't there always this concern about the future? And I can give you the citation after I'm done. It's called Sylgard Container, and it was decided by the Northern District of California San Francisco Division in October 2011, and I've got the site. And what that involved were food containers, and the manufacturer created the containers for tomato sauce, and they found out later that the inside of the containers, sort of the lining of it, may have been defective, and were causing the tomato sauce to discolor, to taste different, to smell funny. Never said it was going to cause food poisoning or botulism. Never rose to that level. Once they discovered this, they got rid of all these containers. Same exact thing here. What were the containers made of? I believe they were made out of metal, but I'm not exactly sure. They're going to leach into the product, and that's true of plastic. That's true of this bottle of water. Right. Probably a hazard, too. Could be. They say if you leave it in your car long enough, it is. Yeah. But what the insured in that case was saying, we had to get rid of all this, we had to get rid of these defective items, just like a coil in a wall, because we're worried about there might be something in the future. The court said that's not enough to show actual physical injury caused by your product. That's not enough. A future, a potential, a hypothetical of what might happen. Let me ask one other question. If, in fact, there had been a delay in opening the hospital, that would have been covered. Under the second prong, loss of use, delay, if, and this is critical, it has to have that causal link, and we see that in advertising. Injury, and this is no different. You have to have a causal link between the coil problem and the delay. So first they had to show actual loss of use, that the hospital opening was delayed, and we don't have any evidence of that. Just an allegation it might be. Then we would have to show that the delay was because they had to replace those coils, and not for any dozen of other reasons on any other construction project in a large hospital like was being built. It could have been because they didn't get the carpet in time. It could have been for a lot of things. What interests me is here we have sort of third-level derivative litigation, and a case that was settled. So no one ever really proved up whether or not, I mean, those issues, right? That's correct. And the question is how do you do that? Would it have to be done in this case? Yeah, I think that what could have been brought before this court, they could have brought an affidavit from someone at UCLA who said part of the settlement was for X. We had quantified it. This is what it was. And what's interesting, and let's go back a little bit to the judicial estoppel. Yes, Tora Ware argued no physical injury. Whether the court granted the demur or not almost isn't important, even though they did. They said no physical injury. UCLA at that point said, you're probably right. We're not complaining of physical injury. And isn't insurance coverage for what the third-party level derivative, what they're claiming up here, what the university is claiming, not what Tora Ware wants to think they might claim or might get? The university said, you're right. We're not even going to oppose that. We just want you to repair and replace it. They just said nothing, and they could have been thinking, well, we don't care if there's a negligence claim in there or not. The damages are going to be the same, so why bother? But we don't know, and there's nothing in the record. All we have is silence, and what we do have is Tora Ware itself saying there is no physical injury. We're telling you, court, we're making a representation to you in support of our demur. But this is the question I was asking before. Is it clear that physical injury for purposes of the distinction in negligence is the same as physical injury for coverage under this statute, under this policy? It probably isn't for at least the reason that loss of use is covered, which would have been excluded as a negligence claim. We're really dealing with two different prongs. I think you're exactly right. The first part is the physical injury, which is not met, but the loss of use is separate. They didn't really deal with that on the demur. That's correct, but there's no evidence here that any of the settlement was paid for loss of use. There was no evidence that there was any delay. There was no evidence that the coil caused the delay as opposed to it could be dozens of other reasons. So that was just sort of thrown in, and, you know, Federal was present at all the settlement. They were willing. They were able to, like, give us some information, and, you know, they didn't even file a reply in this. If they don't have the evidence, they don't have the evidence, probably because it never was there, and there's nothing in the documents attached to Mr. McIntyre's declaration that ever says actual leaks because of those coils caused physical injury. There's some complaints about water through the roof. Paragraph 6 is just his description that we had to go, you know, take the wall out to get to the coil. And one last moment because I see I have about two and a half minutes left. Go ahead. Read me the provision in the insurance policy that you're relying on. The physical injury or the loss of use? Well, you know, people buy these policies, and most of the time they don't even know what they're getting. This is a large manufacturing company, and they had been told several times in the reservation of rights letter. Oh, they're stupid, too. It says... I think you might be wanting to look at ER-195 for the definition of property damage. Yes, and it's also on page 18 of our brief. It's 2 SCR-244, 2 ER-115. I like to hear it from you. Absolutely. Property damage means physical injury to tangible property, including resulting loss of use of that property. All such loss of use shall be deemed to occur at the time the physical injury that caused it. That's prong one. Or loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it. That's the definition. And importantly, in 1973, they added the word physical to the injury, and that's why all the cases relied upon, including Sears, were all based upon the 1966 definition, did not require any physical injury. Moreover, Sears involved a urethane that was physically adhered to the roof. They had to rip it off, literally. When you rip something off, the roof came with it. Here, nothing came with it. That's what I don't understand. That I knew is the difference, right? It doesn't seem like a difference. I think it is a difference, and I think that goes with the integration. Here, if they hadn't finished the drywall, they could have fixed it. It's the method of repair. Also, that policy did not have the word physical injury. The latter is the basis that Vieira said. Both cases didn't apply anymore. Exactly. And Sears, arguably, in Vieira, was heavily questioned, and the case that Sears relied upon, Elger, was Seventh Circuit and was directly rejected by the California courts in F&H construction. I'm out of time. I ask also that our bad faith motion be affirmed on both grounds, since it is a de novo review. The parties agreed, no breach of contract, no bad faith, but federal also believes that even if this court were to reverse the issue of property damage and find no exclusions and all the rest of it didn't apply, everything we did at the time of settlement was reasonable based upon the lack of any evidence of physical injury. Therefore, even if it were to be remanded, the bad faith summary judgment should be affirmed on both counts. Okay. Any other questions that I may answer? Would you like the site of the Sylgard container case? No. I mean, I love passion in these insurance coverage cases. It's what I do. It's general principles of law and business and words, which is what I do. I was a history major, so. No, no. I mean, it's you read it to me, and the ordinary person that reads that stuff would probably think that it includes cutting through a wall. In our view, it doesn't. Let me get the Sylgard. You can put it. Just submit it to the deputy clerk. I apologize for not doing it in advance. I just found it this weekend. That's all right. That's okay. I'll be very, very brief. You went way over time. I did. Can I just have two minutes? How about one and a half? One and a half. The New Hampshire v. Vieira case, it specifically makes a distinction between removing defective material and adding defective material. In fact, it distinguished itself to the Sears case because they said in Vieira they were adding material, not removing it. It makes that specific distinction. The other thing I'd like to comment upon is paragraph 9 of the McIntyre Declaration, which is on the electronic record, page 69. He says that part of his settlement, part of the money that Toral Air paid, was because the university had alleged loss of use. Part of that settlement was, at least in Toral Air's mind, was payment for the loss of use damages. If the loss of use damages are, in fact, covered, then part of that settlement is, in fact, covered. So there's two different inquiries. Is there a loss of use covered? And is there work as to the other subcontractors? They say you never broke it down. You just didn't break it down. In settling the case, Toral Air was faced with a number of damages, and they said, look, we're going to settle all the claims. And our argument is that part of the settlement included loss of use. But you didn't get a breakdown. And this provision, this part of his declaration was not admitted. I believe paragraph, there was never, paragraph 9, I did not see any specific ruling as to paragraph 9 of McIntyre's Declaration. I believe, I do not believe there was a, the court made a ruling as to paragraph 5 of his declaration and a couple of the exhibits. But in reading and rereading the court's ruling. Who was McIntyre? Was he involved in the settlement? McIntyre was the president of the company. So, yes, he was involved in the settlement because the money came out of Toral Air's pocket. So why was it a hearsay? It's not a hearsay. The effect of the claims and why Toral Air settled and paid certain claims, that would be something that Mr. McIntyre would know. He would say, look, we're faced with $5 million in claims. We paid $900,000. We settled the claims. So Mr. McIntyre's statements as to why the settlement is not hearsay, I don't believe was ever ruled by the district court. Thank you very much. Okay. Thank you. Okay, we're going to take a brief recess. We'll be back. And when we get back, we'll take up Verdugo v. Target stores. All rise. Look at this two ladies holding a curtain for me. Every man's dream. This court is in recess. I'll bring that case citation for you. Thank you. I put it away. Okay. Toral Air v. Federal, and we're a federal insurance company. Thank you. All rise. Thank you. Thank you. Thank you. Thank you.  Thank you.
judges: Pregerson, Graber, Berzon